## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | | |
|---|---|---|---|
| JANE DOE, an individual, | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | | |
| | ) | | |
| WOLCOTT DIVERSEY CONDOMINIUM | ) | Case No. | 19-cv-3856 |
| ASSOCIATION, an Illinois not for profit | ) | | |
| corporation, CAGAN MANAGEMENT GROUP, | ) | Judge | _____ |
| INC., an Illinois corporation, JULIE GORDON, an | ) | | |
| individual, MARK SILVERSTEIN, an individual, | ) | **JURY DEMAND** | |
| JIM PETITPREN, an individual, JACOB | ) | | |
| STROHMAN, an individual, and VINCE | ) | | |
| LAVIERI, ESQ., an individual, | ) | | |
| | ) | | |
| Defendants. | ) | | |

## VERIFIED COMPLAINT

NOW COMES PLAINTIFF, JANE DOE ("DOE") (a pseudonym), by and through her attorneys RATHJE WOODWARD LLC, and as and for her Verified Complaint against Defendants WOLCOTT DIVERSEY CONDOMINIUM ASSOCIATION, an Illinois not for profit corporation ("Wolcott"), CAGAN MANAGEMENT GROUP, INC., an Illinois corporation ("Cagan"), JULIE GORDON, an individual ("Gordon"), Mark Silverstein, an individual ("Silverstein"), Jim Petitpren, an individual ("Petitpren"), Jacob Strohman, an individual ("Strohman"), and Vince Lavieri, an individual ("Lavieri") states as follows:

## FACTUAL ALLEGATIONS
### A.     Introduction, Parties, Jurisdiction, and Venue

1.     This action is brought against the defendant condominium association, and its board members, property manager, and attorney (for fraudulent and improper collections actions), arising from their systematic and premeditated plan to force the Plaintiff to move out of her condominium unit through a wide variety of harassing and illegal actions that have created a hostile living

environment. What started out as pressure against her to move by them making fun of her disabilities and telling her it was time to move, soon morphed into an abuse of the association's power, improperly fining the plaintiff, charging her grossly high attorney fees that had no basis or right to be added to her account, and making fun of her in front of the other members. The harassment and illegal actions included the board of directors of the Association (the "Board") having trees outside the Plaintiff's unit nearly scalped after she had informed the defendants how much she emotionally needed that vegetation. No other trees were so savaged. They then illegally keep the Plaintiff off of the 2018/2019 ballot, which has effectively left every one of the current board's actions subsequent to the election as being *ultra vires*. Although state court actions have been added under supplemental jurisdiction, the Fair Housing Act count is the genesis of this federal case, and the state law counts relate directly to the underlying basis of the Fair Housing Act count.

2.      At all times relevant hereto, JANE DOE was and is a resident of Cook County, Illinois, owns 2743 N. Wolcott Avenue, Unit 51, Chicago, and was and is a member of the Wolcott Diversey Condominium Association.

3.      At all times relevant hereto, Defendant Wolcott was and is an Illinois not for profit corporation domiciled in Cook County, Illinois, and operates as a condominium association for the title-holders of units in the Wolcott Diversey Condominium Association (the real estate is sometimes hereinafter referred to as the "Development").

4.      At all times relevant hereto, Cagan was an is an Illinois corporation domiciled in Cook County and was and is engaged in the business of property management.

5.      At all times relevant hereto, Gordon was and is an Illinois resident domiciled in Cook County, owns 2743 N. Wolcott Avenue, Unit 54, Chicago, was and is a member of the Wolcott Diversey Condominium Association, and was and is a member of the Board.

4846-9729-5768, v. 1

6.       At all times relevant hereto, Silverstein was and is an Illinois resident domiciled in Cook County, owns 2743 N. Wolcott Avenue, Unit 47, Chicago, was and is a member of the Wolcott Diversey Condominium Association, and was and is a member of the Board.

7.       At all times relevant hereto, Petitpren was and is an Illinois resident domiciled in Cook County, owns 2743 N. Wolcott Avenue, Unit 37, Chicago, was and is a member of the Wolcott Diversey Condominium Association, and at the times relevant and noted herein, was a member of the Board.

8.       At all times relevant hereto, Strohman purchased was and is an Illinois resident domiciled in Cook County, owns 2743 N. Wolcott Avenue, Unit 43, Chicago, was and is a member of the Wolcott Diversey Condominium Association, and at the times relevant and noted herein, was a member of the Board.

9.       At all times relevant hereto, Vince Lavieri was and is an Illinois attorney engaged in debt collection for the Association.

10.       This Court has jurisdiction over this matter pursuant to 29 U.S.C. Sections 1343 and 1331.  Venue is proper in this Court pursuant to 28 U.S.C. Section 1391.

**B.       Background Information**

11.       On or about June 27, 1996, Wolcott Diversey L.L.C., as "declarant", created the Development as an Illinois condominium development subject to the Illinois Condominium Property Act, by virtue of recording a Declaration of Condominium Ownership and Easements, Restrictions and Covenants for Wolcott Diversey Condominium and Declaration of Bylaws for Wolcott Diversey Condominiums [sic] Association (the "Declaration"), recorded on July 9, 1996, as Cook County Document No. 96522071.  See Declaration and House Rules, attached hereto and incorporated herein as Exhibit "A".

12.       DOE purchased Unit 51 on December 21, 1996.

13.       Wolcott was incorporated as an Illinois not for profit corporation in 1997.

3

14.     In or about February 15, 2004, the Association paid for a reserve study report from The Home Star Group, a true and correct copy of which is attach hereto and incorporated herein as Exhibit "B" (the "2004 Reserve Study").

15.     For approximately 20 years, DOE enjoyed an excellent relationship with the various boards of directors of Wolcott, hosted Board meetings, volunteered to solicit professional architectural advice at no charge, was recruited to serve on various committees, volunteered to head the Landscaping Committee, and in fact served on the Landscaping Committee for 6 years, serving as its Chair before it was disbanded in August 2016 by Gordon and Silverstein, unbeknownst to DOE.

16.     Prior to 2017, DOE was issued not a single violation of the Community Instruments and in fact, only a few violations/fines had ever been issued to anyone in the Association's 20 plus year history.

17.     Gordon purchased Unit 54 in or about 1996.

18.     Silverstein purchased Unit 47 in or about 2002.

19.     Petitpren purchased Unit 37 in or about 2007.

20.     Strohman purchased Unit 43 in or about 2015.

21.     Cagan was hired by Wolcott as its property manager in or about December 2014.

22.     Gordon was appointed to fill a vacancy on the Board on May 9, 2016 and elected in December 2017 and December 2018.

23.     Silverstein was appointed to fill a vacancy on the Board in August 2016 and elected in December 2017 and December 2018.

24.     Petitpren was elected to serve on the Board in December 2017 and December 2018.

25.     Strohman was elected to serve on the Board in December 2016.

26.     In 2014, 2015 and 2016, DOE became increasingly concerned the Board's failure to maintain the property plus failure to maintain adequate reserves had grown from a poor set of

4

decisions to a potential breach of fiduciary duty by the Board, especially given the fact every Board subsequent to the issuance of the 2004 Reserve Study ignored the recommendations for maintenance and funding in the 2004 Reserve Study – and had not updated the study or conducted any contemporary study since.

27.     As a result of DOE's concerns, she became more active in the Board meetings and began asking questions of the Board.

28.     Subsequent thereto, in addition to DOE asking more questions, she began to challenge the analysis, reasoning, and conclusions of the Board in open session, especially when the need to replace the Association roofs found the Board decided to borrow money to replace Association rooves because the Board failed to set aside sufficient reserves, and guessing at new colors without any professional expertise or guidance.

29.     As a result, the Board began a campaign against her as outlined in this complaint.

30.     On May 9, 2016, the Board voted to spend $2,000 on professional architect design guidance to create Master Plan for color changes to roof, gutters and other elements of the building. Gordon was appointed to Board to fill vacancy.

31.     DOE helped secure an architect/design specialist and arranged meeting with the Association's sister Association and designer.  The Board ignored meeting requests.

32.     On or about June 2016, despite an April 2016 letter to the sister Association calling it "very important" to work together under guidance of a design specialist, the Board ignored its own prior vote to obtain professional expertise and decided to not work with its sister Association to select the same roof.

33.     Thereafter, the Board ignored DOE's repeated emails and attempts to encourage the Board and architect/exterior design specialist to meet.

34.     While DOE successfully lobbied owners to pressure the Board into selecting identical roofs as found in the sister association, the Board still ignored its vote to obtain

5

professional guidance on color changes and began to guess on shingle colors and gutter colors – resenting DOE for generating owner involvement.

35.     DOE even offered to personally pay for the cost of an architectural design experts to ensure the aesthetic values of all homes were optimized through the change of colors – but the Board ignored her.

36.     On August 4, 2016, Silverstein rushed out yelling loudly at DOE "It's time for you to go," in front of other owners; one wrote to DOE "I'm sorry you had to go through that."

37.     On August 9, 2016, the Board told owners it has picked a roof, without a formal vote taking place at an open meeting.

38.     The Board passed a special assessment for the roof with only two days' notice, not the required 10 days of notice.

39.     In September 2016, DOE saw Gordon outside and tried to persuade her to use an expert in selecting new gutter colors.  Gordon responded, "Why don't you just move?"

40.     In October 2016, the Board (which lacked experience in architectural design) chose a gutter color without an expert, despite having 6 top architect groups weigh in advising against the chosen color and who called the choice a "mistake", and ignoring all professional architect advice in violation of business judgement rule. Both the roof and gutter represented "material alterations" requiring 2/3 owner vote – but the Board failed to take any owner vote on approving these changes.  The Board told the members they "have [their] own experts", but the roof consultant said the Board "wanted to pick their own colors."

41.     In December 2016, the Board began conducting an active campaign against DOE's candidacy in violation of the ICPA that expressly forbids current Board from expressing preference for another candidate.

42.     Between January 2017 and March 2017, DOE's anxiety about Board negligence with operations, finances and decisions resulted in dozens of emails related to: lack of City permits

for heat tracer cables; lack of a Master Plan for transitioning building colors; lack of plans to repair known courtyard hazards; lack of plans for needed replacements and maintenance of landscape; and lack of a current reserve study to ascertain priority repairs.

43.     The Association's attorney Lavieri informed DOE that he would no longer read DOE's emails, and was no longer authorized to read her emails (January 17, 2017 "I cannot respond to you without Board authorization…"), and that the Board would block her emails.

44.     Nevertheless, to preserve her rights, DOE continued to communicate with Lavieri, Cagan, and the Board to document her ongoing and numerous concerns.

45.     Knowing she would not be charged by the Association because her emails would not be read, she did not hesitate to communicate with them, and sent emails without a concern to shorten or reduce them (in order to have thorough documentation on the numerous Association breaches). DOE continued to discover more breaches of fiduciary duty by the Board, and more Association hazards and therefore continued to document these in dozens of emails.

46.     In April 18, 2017, the Association attorney sent DOE a letter, plainly stating DOE had not been found guilty of any violations – but that the Board demanded the following:

        a.      DOE was prohibited from watering the recently-planted replacement trees (even though there is no rule prohibiting and watering was a long-standing practice encouraged by all prior Boards).

        b.      DOE should plug in heat tracer cables (even though DOE is concerned they have not been permitted by City, and that experts recommend unplugging in warmer months);

        c.      DOE had to replace a bronze outlet exterior cover (even though there are no rules banning them, and the Owner in Unit 46 had an identical outlet cover); and

     d.     DOE was commanded to repair alleged wood damage around her garage door (even though nearly every garage had similar wood damage, and other owners with limited common element ("LCE") damage had been told by Cagan and the Board they can repair on their own timetable such as Unit 49 and wood deck plank).

47.     In April 24, 2017, the Association attorney wrote, "In that you are inundating me with emails, you will be charged back for my time…" even though the same attorney wrote DOE several times in months prior, and stated he would not be reading her emails and he had not been authorized to read her emails. (January 17, 2017: "I cannot respond to you without Board authorization…").

48.     On May 1, 2017, the Former Board president Brian Grossman, who no longer lives in WDCA, wrote JANE, "as you know, the Board DOES NOT want me discussing the Association with you…". This is one of many instances of suppression in which the Board sought to violate DOE's First Amendment rights.

49.     On May 22, 2017, a charge of $800 appeared on DOE's ledger.

50.     On May 22, 2017, Lavieri wrote, "I have nothing to do with chargebacks…" and wrote again, "Discuss the chargeback of our fees with your Board as it is the Board that decides whether or not to chargeback fees…"

51.     There has never been a Board vote in a meeting open to the member regarding charging back fees to DOE.

52.     On May 24, 2017, an additional charge of $558 in unexplained attorney fees appeared on DOE's ledger.

53.     On May 24, 2017, after writing several emails asking the Board for an explanation of the fees, Gordon wrote an email to DOE with subject line as "Communications". The email said, "You have abused the email addresses to the extent we have been forced to do this."

8

54.     DOE would later discover the Association charged DOE approximately $1300 not only for writing a letter to tell her she was NOT guilty of any violation, but including time spent going back as far as October 2016 for phone conversations between Silverstein and the Association attorney discussing DOE (with no violation at that time, either).

55.     She was never given notice about these retroactive charges.

56.     The Board charged DOE attorney fees to tell her she was not guilty, and the fees were almost five times the amount she would have been fined had she been found guilty.

57.     There is no authority for the Board to charge an owner for emails, especially emails the Attorney indicated would be blocked and not read.

58.     On May 24, 2017, Cagan mailed a letter to DOE which in part stated it is a "formal notice of Violation and fine ($100) from the Board" for unplugged cable.

59.     The Board has no authority to predetermine guilt without notice of an alleged violation, a hearing, and a vote.

60.     On May 26, 2017, Janet Nelson of Cagan wrote: "after checking with WDCA lawyer, the bill was adjusted to reflect charges related to your account exclusively.  You are being charged because the Association is permitted to charge back the owner for attorney's fees…to enforce the Declaration."

61.     The referenced "adjustments" were made without giving DOE a hearing, the Board having discussed the "adjustments" in an Executive Session with minutes having been taken, and were made without the Board having voted for the adjustments in a meeting open to the members.

62.     On June 12, 2017, while DOE was watering her potted porch plants, Gordon and Silverstein came onto her porch.  Silverstein first stated to DOE – "I don't like you," to which DOE responded, "I don't care."   Then Silverstein asked, "Have you had your meds yet?" He then turned to Gordon and said, "Julie, I'm worried about her, I don't think she's taken her meds yet,"

9

to which Gordon laughed. Silverstein again, while sitting uninvited on DOE's porch bench next to her, said "JANE, have you taken your meds yet?"

63.     DOE felt humiliated and asked repeatedly for the two Board members to leave her porch and leave her alone.   She documented the incident to the Board that day.

64.     On June 19, 2017, Petitpren walked by while DOE was watering her own potted plants and made a "cuckoo" sound.  DOE documented this in writing to Petitpren that day.

65.     On June 12, 2018, DOE walked outside her unit to ask a group of parents if they could keep the noise down from their children who were playing and screaming loudly for more than three hours, and one of the Petitpren children said to DOE "bye crazy lady."

66.      On June 19, 2017, Lavieri wrote, "…to date, no fine has been levied…". However, DOE's ledger reflected more than $1,000 in attorney fees that have been called "communication fees", "chargeback fees", and "enforcement fees" and a 30-day demand letter sent.  At no point, while placing attorney fees directly onto her ledger, was DOE ever sent or provided an opportunity for a hearing nor an opportunity to defend herself or dispute the charges.

67.     On June 19, 2017, Cagan sent yet another letter of "formal notice of violation and fine from the Board" for watering, despite the fact that there was no rule against watering.  There had been no notice of an alleged violation, no hearing request form, no hearing and no vote to determine guilt.

68.     DOE's watering of vegetation in the common elements did no harm to the vegetation.  Watering had been an accepted practice for over 20 years, and in fact prior Boards appreciated DOE's offer to water newly-planted landscaping.

69.     All landscapers have instructed Boards and DOE on the need for watering.

70.     On June 22, 2017, Cagan sends letter of "formal notice of violation and fine ($100) for having a bronze electric outlet".   Another owner had the exact same outlet and upon information and belief, was never fined.

10

71.     There had been no notice of alleged violation, no form to request a hearing, no actual hearing, and no vote to determine a fine.

72.     On June 27, 2017, DOE sent Lavieri a letter requesting accommodation discussions and challenging the Association's ability to place attorney fees on her ledger without due process by following the Community Instruments.  DOE also notified the Association she would be working with appropriate government agencies on a discrimination complaint.

73.     On June 27, 2017, the Board took a vote at a Board meeting to fine DOE even though she had not been sent any forms to request a hearing, was not issued an alleged violation or been given 14 days to request a hearing, nor been given notice of any hearing.

74.     On July 7, 2017, the Association filed suit against DOE for $1,832.

75.     The Board never took a formal vote in an open meeting on the decision to file suit, and had not delegated to Cagan or any other person or entity the responsibility of filing suit. The Board never ratified its decision made outside a meeting and without a vote, to file the suit.

76.     On July 12, 2017, the Board denied DOE a right to replace landscaping behind her garage but refused to have it replaced, writing "we do not have the budget for landscaping this area."  The Board has never had a maintenance schedule in 22 years and has no plans to replace landscaping that had been damaged or lost for the prior 15 years.

77.     On August 4, 2017, Cagan sent DOE 4 new notices alleging violations: 1) for unplugged cables (which had already been cured); 2) for having a bronze exterior outlet cover; 3) for watering; and 4) for alleged garage door wood damage.   This time a request for hearing form was included.  DOE completed the forms requesting a hearing.

78.     In or about August 2017, DOE sent another accommodation discussion request to Gordon and Cagan, and expressed having health needs that require accommodation discussions. No one responded, thus constituting constructive denial.

11

79.     On September 5, 2017, the Board began harassing and threatening DOE for restoring landscaping on City of Chicago property by restoring ground cover in concrete planter that Alderman tells DOE is permitted since its on City parkway.

80.     On September 6, 2017, Silverstein made a physical gesture (swirled finger around his head) to DOE in front of landscapers, intending to imply she was crazy.

81.     On September 27, 2017, the Board conducted a hearing without any prior notice to DOE, thus she could not have her attorney present.   The Board voted to fine DOE for unplugged cables, for watering ($1,000), for bronze outlet, for garage door damage. The ICPA requires notice of a date, time, and place for a hearing, but DOE received no notice and was thus unprepared for a hearing, and had no opportunity to bring counsel with her.

82.     On October 3, 2017, Cagan sent a letter to DOE confirming fines, except they were not identical to what was voted on.  In the end, the fines were for: 1) watering (voted on); 2) two instances of cables unplugged (the vote had only been 1 fine, not 2 for unplugged cables – yet the final determination letter stated 2 fines for having her winter roof cable unplugged – even though this had been cured before the hearing); and c) bronze outlet (not sent an alleged violation notice on August 4th, nor voted on).

83.     Further, said correspondence included a warning to fix garage door trim, except that violation had been voted on September 27, 2017.  Thus the nature of the fines was changed outside of a meeting and without a vote.

84.     The bronze outlet cover as well as garage damage additionally represented selective enforcement, as other owners had either a bronze outlet cover and/or LCE damage substantially similar to that alleged by DOE, but no other members were given deadlines to correct either.

85.     Meanwhile, multiple other owners were guilty of violations expressly spelled out in the 22-year House Rules – but were never sent warnings, violation notices, nor fined.

86.     On or about October 17, 2017, the Board retained Building Reserves, Inc., to perform an updated reserve study – although at a Board meeting months earlier the Board announced a different vendor, and neither time did the Board discuss its choice of vendor nor take a required vote on selection of a vendor.

87.     The Board intentionally instructed the consultants to leave out the courtyard from the study, which was not only inconsistent with the actions of the Association's sister association which had already replaced both roofs and failing courtyard amenities, but completely inconsistent with the 2004 Reserve Study which had recommended repairing and/or replacing pavers, porches, wood steps, retaining walls, and other elements well before 2019.

88.     Many hazards continued to exist in the Association's courtyard.  The 2017 study (the "2017 Reserve Study") was completed and delivered to the Board on or about December 1, 2018, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "C".

89.     Because it excluded more than $100,000.00 of repair and/or replacement expenses, it was materially misleading. There are still no current plans to repair and/or replace said items.

90.     In its October, 2017 meeting with DOE's attorney, the Board did not deny and in fact tried to justify Attorney Kanyock's account of Silverstein and Gordon mocking DOE for taking medication.

91.     On October 19, 2017, a video was recorded of Board members on DOE's porch harassing her for using a spigot despite there being no prohibition and it having been permitted for 21 years.  DOE felt humiliated by their shouts during dinner hour when owners were home with windows open as she was verbally abused, filmed, and the victim of trespass on her LCE.

92.     The Board members shined a spotlight in DOE's face, filmed her, and said "get her" and promised fines.

93.     The Police issued a report and instructed Silverstein and Gordon to stay away from DOE, and only communicate issues through proper email channels, not ambush her in person on her property.

94.     On the night of December 1, 2017, DOE received a letter from Cagan about her porch pot with lights on and threatened a fine thereon for "interfering" with common elements -- even though the holiday lights were only on her personal potted evergreen not the common element landscaping; multiple other owners (including two actual Board members) had placed numerous Halloween decorations in and on the actual landscaping, and lights on Association's actual common element landscaping; and other owners also had porch pot trees.

95.     On December 5, 2017, the 2017 Reserve Study confirmed the Association had inadequate reserves.

96.     Maintenance recommended from the 2004 study had not been done (i.e. sealing wood siding, sealing red metal elements around property, fixing courtyard and concrete hazards and breaks, inspection of seals and joints, tuckpointing, etc.).

97.     Multiple portions of the property had some deterioration beyond an ability to be repaired due to Board neglect.

98.     These areas have continued to be neglected, and the Association has fallen behind even the new reserve study.

99.     Costs passed to owners are significantly increased due to failure to maintain, requiring constant specials which place an undue burden on current owners while past owners escaped their fair share of maintenance costs.

100.    Repair and replacement costs have increased since that survey was done. By 2020, the Association will be behind more than $150,000 worth of maintenance needed to fix the hazards, flooding and dozens of missing landscaping plaguing the courtyard for 15 years.

101.    In December 2017, upon information and belief, DOE was intentionally not copied on three (otherwise) all-owner emails regarding Board elections and the annual meeting and budget, preventing her an opportunity to run or even vote for the Board, yet strangely she received all other Board emails about a stucco project and reserve study.

102.    On July 7, 2017, the Board filed suit against DOE without legal authority to do so, as Sullivan had never been found guilty of a violation through a proper process to that point. On December 13, 2017, the Board obtained a judgement (the "December 13, 2017 Judgement") against DOE – illegally – and in violation of WDCA By Laws, House Rules, and the ICPA, where determination of guilt MUST come first prior to shifting attorney fees.

103.    On January 18, 2018, Cagan sent DOE the missing emails dated November 20th containing the application for running for Board, the annual budget, and the date for the annual meeting.

104.    Although Cagan acknowledged receipt of DOE's signed form authorizing email as main communication channel on November 1, 2017, none of the emails in late November or early December included DOE as an owner recipient, thus denying her rights to run for the Board and vote for the Board.

105.    On February 13, 2018, DOE paid, under protest, the Judgement.

106.    On March 8, 2018, DOE sent a document request to the Board and Cagan to view contracts.  The Board failed to fully comply with the document request.

107.    In March 2018, DOE's attorney Tom Kanyock contacted DOE to advise her that Lavieri/WDCA had added post judgement fees they neglected to include in final amount despite a recorded Satisfaction Of Judgement.

108.    In March and April 2018, the Board *actively* asked and solicited owners to fill out complaints against DOE for watering (an activity for which there was no rule against, and which

15

she had notified the Board since the drought the prior fall she would be watering per landscaper's instructions to her).

109.     Proactively seeking and requesting other owners to fill out violation notices (while others including Board members were in multiple violations of their own that went unenforced) represented not only a failure to follow the Association's own rules asking owners to work out issues before resorting to violation notices, but constituted more active promotion of a hostile environment conducted by the Board themselves.

110.     At the April 10, 2018 Board Meeting, Gordon told owners the City would never have discovered missing WDCA payments for driveway permit fees but for DOE, and thus DOE was to blame for the costs.  An owner reacted angrily to DOE at the meeting.  The City disputed this statement, and advised DOE the City would have discovered missing fees.

111.     On April 12, 2018, DOE was in the courtyard rinsing bird waste off pavers.  Gordon approached DOE, harassing, stalking, insulting and filming her with an IPad. DOE asked "what's wrong with rinsing bird poop" from the pavers and Gordon responded, "JANE, YOU are the bird poop."  DOE asked again, what damage is done from rinsing pavers and Gordon responded, "JANE, YOU are the damage."

112.     On May 1, 2018, WDCA held a Board meeting to adopt new rules against watering and using spigots, which upon information and belief, are designed to frustrate DOE and go against best practices in Associations, where most owners are asked to pitch in and water landscaping.

113.     These rules were not the result of any standing problem nor desire by owners. While the plan to adopt these rules was unknown to DOE, the Board knew for months, engaged the Association attorney and wrote rules with higher and escalated fines.

114.     Upon information and belief, the Board sat on  -- for weeks and months – 10 separate violation notices (all for watering) they proactively solicited and filled out themselves,

just so they could wait until an actual and clear rule banning watering was adopted, along with severely escalated fines. Essentially, the Board entrapped DOE.

115. DOE had even written the Board months prior letting them know she would be watering, based on landscaper advice – and no one wrote her back suggesting she could not.

116. On May 1, 2018, the Board formally adopted a rule against watering and a rule against water flowing from exterior spigots into the ground.

117. On May8, 2018, Cagan and the Board sent DOE 10 separate Violation notices in 10 envelopes all in one day, totaling a potential $1,500 worth of fines retroactively and illegally.

118. On May 25, 2018, Silverstein harassed DOE loudly in the courtyard when she was catching up with Charlie Miller from The Care of Trees, the Association's tree maintenance contractor whom DOE worked with prior in her Landscape Committee duties.

119. DOE explained to Silverstein why they were chatting and noted the importance of seeking owner input on tree view desires prior to any pruning and trimming.

120. DOE begged Silverstein not to be careless about losing limbs at the West Unit Kitchen levels that cannot be restored and forever eliminate green outside the West living levels, reminding Silverstein not to turn trees into "telephone poles" of just trunks, a few limbs and leaves.

121. Miller spoke with Silverstein and said he would come back after giving owners' notice, which is how he prefers to work and what happens with most Associations.

122. Later that same day, DOE attempted to leave her home several times to run errands but was so fearful Silverstein would bring the tree vendor back and savage trees near her window that she returned home within minutes again and again.

123. DOE then sent Gordon at least 5 emails with photos of tree views and pleading with Gordon to give owners notice like past Boards so they could request their tree views be maintained.

124.    DOE could not bring herself to leave her home, her fear of returning to savaged trees was so intense. She called Miller's company office several times to make certain they weren't coming back onto the property.

125.    On May 26, 2018, tree contractor Charlie Miller wrote to DOE reassuring her, "I made it clear to Mark and Julie I want to work with you on your tree views."

126.    On May 26, 2018, Silverstein sat in the courtyard blowing cigar smoke at DOE, even though she had communicated her lung and eye issues several times to Board. He stalked her and filmed her on her porch, simply because she indicated due to the record heat, the new trees should be watered.

127.    On July 4, 2018, DOE wrote Miller and attached photos of her lush tree views, said how much she is enjoying her trees outside the window and how much benefit she receives as an autoimmune patient with a need to reduce stress.

128.    Miller responded "glad to hear…we won't return for a while but will let you know."

129.    On July 17, 2018, at a Board meeting, the Board told owners they "had no choice" and that the law "compelled" the Board to bring suit against another owner (despite previous emails from Lavieri to DOE that the fee shifting/chargebacks were a "board decision").

130.    In perpetuating a hostile environment, the Board told owners almost $25,000 in attorney fees had been spent year to date.

131.    There is no record of this amount of attorney invoices, and bills incurred by the Association's pursuit of DOE have been paid in part by DOE (illegally charged to her), or the WDCA insurance carrier.

132.    Owners turned to DOE because upon information and belief, the Board made owners believe it was DOE's fault for needlessly racking up attorney fees.

133.    The Owner in Unit 45 angrily snapped at DOE, "Why don't you pay your assessments?" This confirmed DOE's suspicions the Board had been disparaging her to other

18

owners in an attempt to prevent her from being elected to any future Board – and in bad faith, making owners believe the 2017 lawsuit was strictly due to DOE not paying her owner assessments.

134.    On July 18, 2018, DOE made a request to the Board and Cagan to allow her to look at legal invoices year to date.  DOE received no response.

135.    From July 18, 2018 through July 22, 2018, DOE sent multiple records requests to the Board and requests for an explanation of Attorney charges dating back to 2016 (such as phone calls between the Board and Lavieri, and an alleged "interference" which was not the subject of a violation notice, hearing or Board vote).  The Board did not respond with information.

136.    On July 23, 2018, DOE returned home in the evening to find the two trees, and only those trees, outside her kitchen windows, had been nearly "scalped" from the ground through second window height, eliminating the lush limbs and tree views she had that morning.

137.    No other courtyard tree had those types of cuts.

138.    Yet the trees outside her unit were turned into exactly what she feared – trees that look like telephone poles.

139.    The trees outside Gordon's unit, by contrast, we left untouched, and were so lush they overlapped. Not only were those trees untouched, but dead limbs were also untouched.

140.    Only DOE's trees were cut back in this manner.

141.    Knowing a) DOE was responsible for rallying owners months earlier to save the tress on the west Wolcott parkway from the Board's intention to remove them, b) she was known to the members as a champion of protecting the lush landscaping originally beautifying the property, and c) she fought for a decade to restore the deteriorated, damaged and once-valuable landscaping asset, the Board knew the trees and landscaping were greatly valued by DOE.

142.    They also knew in August 2017 when writing Cagan and the Board requesting an accommodation discussion, she referred to the landscaping and its connection to her health issues.

19

143.     On July 24, 2018, DOE called Chalet grounds crew and asked if they cut the trees. Chalet told DOE "we don't do tree work, only ground pruning…we don't have the equipment, training nor expertise…can't imagine it was any of our crew."  This affirmed a text message Chalet sent DOE months earlier when she inquired about their scope of work, "We don't manage your trees" and is further confirmed by DOE calling Chalet's main office several times to ask whether they do tree trimming and was told "No" and that at most, Chalet sub-contracts tree work to The Care of Trees.

144.     Thus, someone either ordered a non-qualified grounds crew to climb up trees outside DOE's windows and savage all limbs in her view, without any tree expertise, or Chalet the grounds crew violated their company policy and sent an unqualified crew member to undertake non-contracted work they have no qualifications or authority to perform.

145.     There was no landscaping rationale for this tree decision, which has severely compromised DOE's view, privacy, and property value, thus evidencing malice and retaliation, and violating the Business Judgment Rule again.

146.     On July 31, 2018, Cagan and the Board sent owners notice of a "Special Meeting of the Board" on August 7, 2018 for the purpose of holding a hearing on violations by an owner.

147.     There had not, in 21 years, been a special meeting notice highlighting owner violations sent.

148.     The Board failed to send notice of the date, time and place for the DOE hearing in September 2017.

149.     On August 3, 2018, DOE sent another email to Cagan and the Board with details of her chronic autoimmune illness, and a reminder of her stage 3 cancer history.

150.     The email also offered to bring medical records or physician letters detailing additional and specific diagnoses to connect her accommodation discussion request to her health issues and to validate the impact of Silverstein's blowing smoke toward DOE which required

20

reasonable accommodations due to the bylaws that prohibited noxious activities. DOE received no response.

151.     On August 7, 2018, the Board voted guilty on all ten notices of retroactive fines for activity that occurred prior to proposed or adopted new rules.

152.     On August 22, 2018, DOE's ledger jumped from $1,800 in the morning, to $8,000 by the afternoon without explanation.

153.     On August 26, 2018, after the Board spent 2 years sending DOE a total of 14 sperate violations (none of which referenced a specific rule which is specifically asked for on the Association's official form), and all of which denied due process rights, and none of which broke any codified rule at the time, DOE documented more than a dozen direct violations of explicit and 20-year standing rules, with the perpetrators being Board members that had been allowed to be in violation going back years, and for which no Board member ever corrected nor was fined themselves.  DOE sent documents to Cagan and the Board.

154.     On August 28, 2018, DOE walked over to Silverstein's driveway and asked Silverstein to stop smoking while she is out on her deck.

155.     Silverstein inhaled and puffed even harder, pointing the smoke directly at her face.

156.     On September 5, 2018, the Association attorney sent a letter without complying with records request from July to see the Chalet contract and claimed the Chalet contract provides for summer pruning "to control height and shape, while maintaining a natural appearance…light pruning will be done as needed."

157.     This was a bad faith, malicious effort to mislead DOE, as trees are not controlled for height and Chalet does not manage trees, let alone for height.

158.     Chalet also directly tells consumers it does not perform any work at all on trees, and Chalet texted DOE in May that "we don't manage your trees."

159.    Lavieri also threatened to impose per diem fines on the alleged garage door wood damage despite nearly every garage having similar damage, and despite no per diem threats had been issued to Board members in flagrant violations for years and the entire last 18 months pursuing DOE.

160.    On September 10, 2018, DOE sent the Board more notices of Board member violations, including a hazardous charcoal grill on a wood deck.

161.    On September 14, 2018, Cagan sent a notice of "Special Meeting of Board" slated for September 17, 2018 in order to pass a special assessment.

162.    The Notice was sent with less than the required 10-day notice of any meeting to pass a special and the second time WDCA had failed to provide proper notice of meeting to pass a special assessment.    See September 14, 2018 email and notice of special meeting, a true and correct copy of which is attached hereto as Exhibit "D" and incorporated herein.

163.    On November 5, 2018, the Board held an Executive Session after the Board meeting to consider the dozens of violations of themselves sent in by DOE.

164.    The Board voted to find each perpetrator not guilty for each violation.

165.    The Board agreed to give months of time for Board members to "cure" their violations, a right not afforded DOE with respect to any of her alleged violations.

166.    The Board further "exempted" Silverstein from complying with grill restrictions on a wood deck, something he has been in violation of for years.

167.    The following day, DOE was told by the Association's insurance broker that the carrier would drop the Association's policy if Silverstein ignored the Association's grill restriction. Upon information and belief, the Board never checked with its insurer, broker or carrier prior to granting an "exemption" to Silverstein.

168.    In stark contrast to how DOE's ledger has been handled for two years whenever the WDCA attorney declared he "had to" become involved to "enforce" the Declaration, the Board

had the Association attorney representing them *personally* in the executive session hearing and neglected to shift those attorney fees for their *personal* violations onto their ledgers.

169. On November 6, 2018, Cagan sent forms inviting owners to run for the Board and indicated the Board election and annual meeting would be held December 18, 2018.

170. On November 12, 2018, DOE sent in a candidate form to Cagan before the close of business, exactly as Cagan asked, and modeled identically after candidate response forms turned in by current Board members when they ran in 2017.

171. On December 6, 2018, Cagan and the Board sent DOE a violation notice for having Christmas décor in a concrete planter behind her garage on an LCE.

172. DOE placed décor there every year for decades. There was no rule prohibiting it.

173. DOE filled out a request for a hearing within the 14-day deadline intending to be heard and make the case for why her décor is not in violation.

174. Silverstein, who sent this violation notice, was at the time personally in violation for having placed a Comcast sign for more than two years in the Common Elements/Landscaping in front of his home. This represents yet another example of Board's unequal treatment of DOE by sending her violation notices before even examining themselves for any violations, and while being in their own violations that went unenforced.

175. On December 14, 2018, Angelina Helms from Cagan sent DOE an email stating her account balance was now approximately $16,000.

176. DOE's attorney wrote Lavieri requesting an itemized accounting.

177. Lavieri and the Board failed to send the information requested.

178. On December 18, 2018, DOE examined election ballots ahead of attending the annual meeting and discovered her candidate statement was not included.

179. At the meeting, DOE inquired as to why her statement was not included.

23

180.    In front of others, the Board criticized DOE's candidate statement, and told owners DOE's form was "improper" and represented "nothing more than a laundry list of complaints."

181.    In front of other owners at the 2018 Annual Meeting, Board members criticized DOE's ballot despite a prohibition in the ICPA from expressing preferences about candidates.

182.    They told her it was an invalid form even though she used the same form as was used by Petitpren.

183.    They faulted DOE for emailing the form (as was Cagan's specific request of all owners), saying she had to comply with unique rules of mailing the form to Cagan if she wanted to be eligible. This violated the ICPA's prohibition of creating multiple classes of membership.

184.    Mailed requests by DOE failed to generate required responses from Cagan/Board.

185.    The Board then eliminated DOE from election consideration. Thus only three candidates remained on the Ballot and the Board was re-elected without a challenger.

186.    Therefore, the current Board is illegitimate, and invalidates any decisions, including spending, by the current Board.

187.    On December 23, 2018, the Board removed DOE's Christmas décor without telling her, without authority, and without having granted DOE a hearing to adjudicate the issue, thereby denying her due process.

188.    Not only did the Board ignore another Unit owner's blinking holiday lights which the Board previously prohibited, but Silverstein did so as a member of an illegally constituted/invalid Board.

189.    DOE was further threatened with the "cost" of pulling out the small Christmas decorations even though there was no cost, and the Board determined her guilty before removing her décor which they falsely labeled "landscaping".

190.    Beginning in 2016, DOE revealed to the Board that she suffers from certain medical conditions (hereinafter "Disabilities") that classify as disabilities under federal and Illinois law.

24

191.    Due to the importance of medical confidentiality, DOE will not provide more detail herein and will seek to seal any pleadings that disclose in writing DOE's Disabilities.

192.    DOE repeatedly reminded members of the Board of her Disabilities and requested accommodations, including but not limited to her health problems with cigar smoke.

193.    Board members intentionally spoke out loud and in public when it mentioned DOE taking medications.

194.    The Board has never asked DOE what accommodations she is seeking.

195.    The Board has never responded to DOE's request for accommodations.

196.    The Board has taken no action to stop, curtail, reduce, or even discuss Silverstein from blowing cigar smoke at DOE.

## COUNT I: VIOLATIONS OF THE FAIR HOUSING ACT
### (AGAINST ALL DEFENDANTS EXCEPT LAVIERI)

197.    DOE restates and realleges Paragraphs 1-196 hereof as and for Paragraphs 1-197 of this Count I as though fully set forth herein.

198.    Title 42 U.S Code, § 12182, (a) states: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who    owns, leases (or leases to), or operates a place of public accommodation.

199.    Title 42 U.S Code, § 12182, (b)(1)(A)(i) states: "It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity."

200.    Title 42 U.S Code, § 12182, (b)(1)(D)(i)(ii) states: "An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods

of administration— (i) that have the effect of discriminating on the basis of disability; or(ii) that perpetuate the discrimination of others who are subject to common administrative control"

201.   Title 42 U.S. Code, §12182, (b)(1)(E) states: "It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."

202.   Title 42 U.S Code, §12182, (b)(2)(A)(ii)(iii) states: "(ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations; (iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

203.   Pursuant to 42 U.S.C. §3604(b), it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of …religion, sex, familial status, or national origin."

204.   Pursuant to 42 U.S.C. § 3617, it is unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of … any right granted or protected by section … 3604 … of this title."

205.   Pursuant to 42 U.S Code, § 12182 (a), no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the facilities, privileges, advantages,

26

or accommodations of any place of public accommodation by any person who owns, leases, or operates a place of public accommodation.

206.    Pursuant to 42 U.S.C. § 3617, the FHA also makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of any right granted or protected by substantive protections of the FHA.

207.    These sections prohibit discriminatory harassment that unreasonably interferes with the use and enjoyment of a home—by another name, a hostile housing environment.

208.    DOE ensured unwelcome harassment based on her disabilities.

209.    DOE's disabilities are protected characteristics under the Fair Housing Act.

210.    The actions of the Defendants in this Count I were severe and/or pervasive enough to interfere with the terms, conditions, and/or privileges of her residency, and/or in the provision of services or facilities under the Fair Housing Act.

211.    For those actions taken by the Defendants as noted above, they are liable to DOE under the Fair Housing Act, and for those actions taken by other persons, there is a basis for imputing liability onto those defendants.

212.    Creating and/or allowing the hostile environment noted above is a violation of the Fair Housing Act.

213.    DOE was damaged as a result of the actions of the Defendants.

214.    Defendants engaged in unlawful disability discrimination in violation of the FHA, 42 U.S.C. § 3604(b) against DOE in the terms, conditions, and privileges of renting her apartment at Wolcott Diversey Condominium Association, and in the provision of services and facilities in connection therewith because of DOE's disability.

215.    Defendants violated the FHA, 42 U.S.C. § 3604(b), by failing to fulfill their duty to take prompt action to correct and end the disability-based harassment suffered by DOE at the hand of Gordon and Silverstein.

216.     Defendants retaliated again DOE in violation of the FHA, 42 U.S.C. § 3617, by limited her access to facilities and resources, by intimidating and threatening her, and by attempting to evict her through duplicity and fabrication because DOE asserted her right to an equal opportunity to use and enjoy the property without being subject to disability-based harassment and her exercise of her first amendment rights.

217.     Defendants' actions were taken intentionally, willfully, and in disregard for DOE's federally-protected rights, and constituted a discriminatory housing practice under 42 U.S.C. § 3602(f).

218.     DOE is an "aggrieved person" as defined in 42 U.S.C. §3602(i).

219.     DOE has been injured by Defendants' discriminatory conduct and has suffered damages as a result under 42 U.S.C. § 3613(c), and is thus entitled to and seeks actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff prays that this Court enter an order declaring that the discriminatory conduct of Defendants as set forth above violated the Fair Housing Act, as amended, 42 U.S.C. § 3601, *et seq*., awarding Plaintiff compensatory and punitive damages pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c)(1), awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fee, and granting such other and further relief in favor of Plaintiff as this Court deems just and proper to prevent unlawful discrimination (including on the basis of disability) in the future and to eliminate, to the extent practicable, the effects of Defendants' unlawful practices.

## COUNT II: BREACH OF FIDUCIARY DUTY
### (AGAINST ALL DEFENDANTS EXCEPT CAGAN AND LAVIERI)

220.     DOE restates and realleges Paragraphs 1-219 hereof as and for Paragraphs 1-220 of this Count II as though fully set forth herein.

28

221. Pursuant to 765 ILCS 605/18.4 of the Illinois Condominium Property Act (the "ICPA"), "[i]n the performance of their duties, the officers and members of the board, whether appointed by the developer or elected by the unit owners, shall exercise the care required of a fiduciary of the unit owners."

222. The Board is required to act in the best interest of the Association and place the interest of the unit owners as a whole above their own individual interests.

223. As Directors of a condominium association, Gordon, Silverstein, Strohman, and Petitpren, owed DOE a fiduciary duty to: (1) protect her property and to refrain from taking actions designed to damage that property; (2) act fairly, reasonably, and without bias in connection with the business of the association, including but not limited to conducting the 2018-2019 annual meeting for the election of Directors; (3) act fairly, reasonably, and without bias in enforcing the covenants and rules and regulations set forth by the Association and established by the ICPA; and (4) to provide DOE with access to the books and records of the Association in accordance with 805 ILCS 105/107.75 and 765 ILCS 605/18.5.

224. Article VIII of the Declaration provides that maintenance, repairs, and replacements of the Common Elements shall be furnished by the Association, and the cost of such maintenance, repairs and replacements shall be part of the common expenses, subject to the By-Laws, rules and regulations of the Association.

225. In acting as the Board for the Association, Gordon, Silverstein, Strohman, and Petitpren owed duties to DOE to act reasonably.

226. Section 9(c)(2) of the Act requires that "[a]ll budgets adopted by a Board of Managers on or after July 1, 1990 shall provide for reasonable reserves for capital expenditures and deferred maintenance for repair and replacement of the common elements." (Emphasis added.) 765 ILCS 605/9(c)(2)(West 1992).

4846-9729-5768, v. 1

227.     The Defendants breached their duty by failing to strictly comply with the Community Instruments and the ICPA in its handling of association finances.

228.     Gordon, Silverstein, Strohman, and Petitpren violated the aforementioned duty to act reasonably, as well as their fiduciary duties, by one or more of the following actions:

a.      prosecuting DOE for alleged violations while ignoring violations of other members and even violations of other Board members;

b.      damaging and removing DOE's property;

c.      interfering with attempts to identify and punish the perpetrator of vandalism at DOE's home in order to prevent further occurrences thereof;

d.      preventing DOE's access to books and records of the Association;

e.      preventing DOE from having a fair opportunity to run for elected office as a Director of the Association, and/or improperly failing to put DOE on the ballot without a right to keep her off;

f.      failing to reasonably exercise their authority to correct known deprivations of the DOE's rights;

g.      severely cutting back the trees outside DOE's unit, with a direct impact to her home's value and her quality of life within her Unit;

h.      failing to enforce the Community Instruments against themselves and/or failing to enforce the Community instruments in an unbiased manner, including dismissing their own violations;

i.      failing to follow the Community Instruments, including but not limited to giving proper notice of Special Assessments;

j.      mismanaging funds by failing to reserve for future maintenance obligations;

k.      unreasonably delaying bidding for repair work to DOE's unit;

l.      permitting the continuation of a known dangerous condition (Silverstein's charcoal grill on wood deck) to exist on the limited common elements, and issued the invalidation of the Association's insurance;

m.     using unfounded and unjustified threats to force DOE to sell her home;

n.     promoting measures such as the new rules prohibiting watering which targeted DOE for the imposition of restrictions contrary to the Association's best interests, existing covenants, rules, regulations, and fiduciary duties;

o.     charging DOE attorney fees related to actions not the subject of a default finding by the Association after notice and hearing in violation of the community instruments;

p.     charging DOE fines grossly out of proportion and unreasonable fees, attorney fees, and fines;

q.     fining DOE for violation of the 2018 anti-watering rules adopted *after* the alleged actions took place;

r.     slandering DOE by telling other members DOE failed to pay assessments when the unpaid balance on her ledger was due to improperly-applied attorney fees and fines rather than unpaid assessments;

s.     filing suit against DOE without the decision having been made by a properly-elected Board due to the improper election tampering of DOE having been intentionally left of the board; and

t.     charging DOE attorney fees for Lavieri reading DOE's emails after having repeatedly telling DOE he would not read emails from DOE;

u.     failing to process her application for being on the 2017 and 2018 ballots;

v.     failing to keep adequate reserves;

4846-9729-5768, v. 1

    w.      engaging in self-dealing by fining DOE for alleged violations but exempting themselves;

    x.      failing to solicit and follow the advice of experts and/or professionals in exterior architecture with regard to the selection and purchase of a new roof and gutters, as well as landscaping; and

    y.      otherwise taken actions to breach their fiduciary duties to DOE.

229.    Upon information and belief, Cagan had a fiduciary duty to the Plaintiff, as a hired manager of the Association, which arose out of the Association's contact with Cagan.

230.    Gordon, Silverstein, Strohman, and Petitpren also breached their fiduciary duties to the Plaintiff by aiding and abetting, encouraging and facilitating DOE's denial of access to the books and records of the Association, and keeping DOE from verifying, in a timely fashion, election results in which DOE may have been improperly excluded from office.

231.    Cagan violated its fiduciary duty to the Plaintiff by affirmatively interfering with attempts to identify and punish the perpetrator of vandalism at DOE's home in order to prevent further occurrences thereof and acting to prevent DOE's access to books and records of the Association, and interfering with DOE having a fair opportunity to run for elected office as a Director of the Association.

232.    Gordon, Silverstein, Strohman, Petitpren, and Cagan agreed to achieve the otherwise lawful objective of maintaining control of the Association through the unlawful means of, among other things, intimidating DOE and damaging her property, withholding DOE's access to Association records and the rights to participate in Association governance, creating restrictions targeted solely at DOE, misusing the Association's hired attorney(s) and landscapers to achieve their personal agendas which were in conflict with their duties to the Association and to DOE as a Member thereof, and upon information and belief, the falsification of Association documents.

233.    Gordon, Silverstein, Strohman, and Petitpren each failed in their duty to protect the members by ordering a reserve study that failed to address the courtyard, and then failing to properly determine and then collect appropriate reserves for the Association, and failing to take into consideration updated repair and replacement costs for common areas.  Instead, they spent Association funds on attorney fees to prosecute DOE for alleged violations of rules that did not exist at the time of the allege acts, yet failing to properly investigate DOE's allegations against Silverstein for blowing smoke toward her.

234.    Gordon, Silverstein, Strohman, and Petitpren failed to act in a manner consistent with the exercise of their fiduciary duties owed to DOE, including, as Illinois law requires, strict compliance with the condominium declaration and bylaws, and the failure to do so resulted in DOE sustaining significant damages including, but not limited to, emotional distress, loss of opportunity to participate in Association governance, costs incurred in an effort to compel access to the books and records of the Association, and other circumstances.

235.    As a result of these and other violations by the Board, DOE has been personally and individually injured by Gordon, Silverstein, Strohman, and Petitpren's breaches.

236.    Gordon, Silverstein, Strohman, and Petitpren's actions have injured DOE in an amount in excess of $50,000.000.

WHEREFORE, Plaintiff JANE DOE respectfully requests that this Court enter judgment against these Defendants, jointly and severally, for actual damages, attorney fees, and costs in an amount to be determined at trial, to the extent allowed punitive damages in an amount exceeding $50,000.00, costs incurred in bringing suit, and such other and further relief as the Court deems reasonable and just in accordance with applicable law and rules of equity.

33

## COUNT III: EQUITABLE APPOINTMENT OF A RECEIVER
### (AGAINST THE ASSOCIATION)

237.     DOE restates and realleges Paragraphs 1-236 hereof as and for Paragraphs 1-237 of this Count III as though fully set forth herein.

238.     On or about February 15, 2004, the Association received the 2004 Reserve Study.

239.     The 2004 Reserve Study recommended the Association assess, collect, and reserve funds for expected future repairs and capital improvements.   It also recommend to seal wood siding every 5 to 7 years to extend its life up to 40 years, and the Board has not had it done once. It further stated a "cash infusion" was "required" or "loans will be required."

240.     The Board failed to comply with the recommendations in the 2004 Reserve Study, failing to complete, inter alia, exterior wood staining (approx. $13,000), west wood deck replacement (approx. $5730), exterior porches and stairs (approx.. $18,930), soffits and fascia repairs/replacement, concrete driveway apron (approx.. $24,000), replace wood steps (33 sets), entry pavers (approx. $7,200), walkway pavers ($12,720), etc., all of which are to be completed before 2024.   In 2016, the Association had only saved approximately $69,000 in reserves, but the study suggested a reserve balance of $103,182.00 after having spent $244,958.00, putting the Association behind by $279,140.

241.     The Board breached its fiduciary duties by instructing the consultants of the 2017 Reserve Study to leave out the courtyard, a key selling point for the Association

242.     The Board also breached its fiduciary duties by failing to comply with the recommendations of the 2017 Reserve Study.  By the end of 2019, the study recommended having an ending balance of $90,679 (which did not include reserves for re-doing the courtyard) after having spent $50,296, for a total of $140,975, and the Association had less than $70,000.00 saved. By the end of 2022, the study suggests the Association should have spent $199,049 and an ending balance of $66,716, accounting for $265,765 for capital projects. The Association currently only

has approximately $60,000 in reserves, and in 2020 the Association is to spend $97,801, which means unless special assessments higher than the Association has ever imposed are enacted, by 2024, the Association's reserves will be underfunded by more than $500,000.00.

243. The Defendants' failure to take steps to substantially comply with the 2004 and 2017 Reserve Studies is a breach of the Defendants' fiduciary duty by failing to strictly comply with the requirements of the Declaration and the ICPA in their handling of association finances, including by: (1) failing to properly budget the Association's operations; and (2) failure to properly ensure the Association holds adequate reserves.

244. Pursuant to 805 ILCS 105/112.50, grounds exist for dissolution as a result of the Defendants' failure to take steps to raise funds necessary to protect the interests of the Members by failing to hold adequate reserves.

245. Pursuant to 805 ILCS 105/112.55, this Honorable Court has jurisdiction to appoint a provisional director or custodian.

246. The appointment of a provisional director or custodian is necessary in order for the Members to be protected against potentially devastating financial obligations in the event one or more of the assets, systems, or elements of the common elements fails and needs to be replaced.

247. This Court, having inherent equitable authority, has the power to appoint a receiver to resolve the extraordinary fraud described herein, to preserve DOE's property from further material injury, and to rescue DOE's property from threatened destruction.

248. DOE, as the owner of her condominium unit, has a right to the property and she will suffer irreparable harm if the property is not taken into receivership.

249. The property is in danger of loss from neglect, waste, misconduct, or insolvency.

250. DOE, as an owner of a unit, has a right to the premises.

251. As a result of Defendants' conduct, DOE has lost value in her condominium as a result of the Board failing to properly reserve.

4846-9729-5768, v. 1

252.    It is only by the appointment of a receiver that DOE's and the other member's property can be adequately protected.

253.    Pursuant to 735 ILCS 5/2-415, this Honorable Court should not require a bond.

WHEREFORE, Plaintiff JANE DOE respectfully requests this Honorable  Court appoint a receiver to take over management of the Association and/or require judicial supervision of the dissolution process, award Plaintiff her attorneys' fees and costs to the extent recoverable under Illinois law, and award Plaintiff any such other relief as this Court deems just and necessary.

## COUNT IV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST DEFENDANTS GORDON AND SILVERSTEIN)

254.    DOE restates and realleges Paragraphs 1-253 hereof as and for Paragraphs 1-254 of this Count IV as though fully set forth herein.

255.    Gordon and Silverstein, as Board members, owed DOE a duty of care.

256.    Gordon and Silverstein, by their conduct alleged herein, breached that duty.

257.    DOE was injured as a result of Gordon and Silverstein's actions including, but not limited to, emotional damage as well as physical harm which manifested in the following physical conditions: panic attacks, difficulty breathing, and migraine headaches.

258.    Gordon and Silverstein's conduct was the proximate cause of DOE's damages.

WHEREFORE Plaintiff JANE DOE respectfully requests that this Court enter judgment in her favor against Defendants Gordon and Silverstein on this Count IV for actual damages in an amount in excess of $50,000.00 as proven at trial, attorneys' fees and costs to the extent recoverable under Illinois law, and any such other relief as this Court deems just and necessary.

## COUNT V: VIOLATIONS OF THE ILLINOIS HUMAN RIGHTS ACT
### (AGAINST ALL DEFENDANTS EXCEPT LAVIERI)

259.    DOE restates and realleges Paragraphs 1-258 hereof as and for Paragraphs 1-259 of this Count V as though fully set forth herein.

4846-9729-5768, v. 1

260.    Section 102(A) of the Illinois Human Rights Act (the "IHRA") prohibits discrimination in connection with real estate transactions, access to financial credit, and the availability of public accommodations because of a person's physical or mental disability.

261.    Section 3-101(A) extends the reach of the IHRA over condominiums.

262.    Section 3-102(B) also prohibits discriminatorily altering the terms, conditions, or privileges of the rental or lease of a home, and discrimination in furnishing facilities or services in connection with the rental or lease of a home "because of" a person's disability.

263.    The actions of the Defendants named in this Count V created a hostile living environment in violation of the IHRA, including but not limited to: a) informing other owners in the development that DOE did not pay her assessments when the charges on her account were not for unpaid assessments but instead from fines improperly placed on her account, and then attorney fees that were improperly as well, added attorney fees that were not paid; b) mocking DOE's her disabilities; c) blowing, or allowing Silverstein to blow, cigar smoke toward DOE and ignoring the violations; and d) ignoring the restrictions in the Community Instruments as they apply to others but applying them strictly against DOE.

264.    Silverstein and Gordon both acted with malice as noted above because in part: a) they both knew how highly DOE valued the trees outside her unit; b) both knew the strongly negative impact that the cutting back of those trees would have on DOE and her physical and emotional health; and c) both knew how severely it would impact DOE to see the Board leave all other trees in the courtyard effectively untouched but severely cut back hers.

265.    Pursuant to 775 ILCS 5/3-105.1, the IHRA also makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of any right granted or protected by Article 3 of the IHRA.

266.    Defendants' unlawful disability discrimination violated 775 ILCS 5/3-102.

267.     Defendants have discriminated against DOE in the terms, conditions, and privileges of renting her apartment at Wolcott Diversey Condominiums Association, and in the furnishing of facilities and services in connection therewith because of DOE's disability.

268.     Defendants violated the 775 ILCS 5/3-102 and/or 105.1, by failing to fulfill their duty to take prompt action to correct and end the disability-based harassment suffered by DOE at the hands of other residents, including Silverstein.

269.     Defendants retaliated against DOE in violation of 775 ILCS 5/3-105.1, by limiting her access to facilities and resources, intimidating and threatening her, and attempting to fine her to such a degree to force her to move because DOE asserted her right to an equal opportunity to use and enjoy the property without being subject to disability-based harassment.

270.     Defendants' actions were taken intentionally, willfully, and in disregard for DOE's state-protected rights, and constituted unlawful discrimination and a civil rights violation, as defined in 775 ILCS 5/1-103 (D),(Q),5/3-102.

271.     DOE is an "aggrieved person" as defined in 775 ILCS 5/1-103(B).

272.     DOE has been injured by Defendants' discriminatory conduct and has suffered damage as a result.  Accordingly, under 775 ILCS 5/10-102, DOE is entitled to and seeks actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff prays that this Court enter an order declaring that the discriminatory conduct of Defendants as set forth above violated the IHRA, and to the extent allowable also the Fair Housing Act, as amended, 42 U.S.C. § 3601, *et.seq*., declaring that the discriminatory conduct of Defendants as set forth above violated the IHRA, 775 IILCS 5.1-101 *et seq,* awarding Plaintiff compensatory and punitive damages pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c)(1), and 775 ILCS 5/10-102(C)(1), awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fee, and granting such other and further relief in favor of Plaintiff as this Court deems just and proper to prevent unlawful discrimination (including

38

on the basis of disability) in the future and to eliminate, to the extent practicable, the effects of Defendants' unlawful practices.

## COUNT VI: VIOLATIONS OF COMMUNITY INSTRUMENTS, *PALM II*, AND ICPA
### (AGAINST ALL DEFENDANTS)

273.    DOE restates and realleges Paragraphs 1-272 hereof as and for Paragraphs 1-273 of this Count VI as though fully set forth herein.

274.    The Defendants had a duty to the Members comply with the Community Instruments, including the ICPA.

275.    The Defendants failed to comply with the Community Instruments, including the ICAP, in one or more of the following ways:

a.      Failed to conduct a proper Board vote by a duly constituted board, and in a meeting open to the Members for: 1) altering the common elements (decision to change roof color and select Owns Corning Tru Definition Duration shingles in Estate Gray, and altering the common elements by changing gutter colors), and choosing the colors without the benefit of an expert which overturned (without a vote) a prior vote to hire experts in 2016 to advise them, and failing to secure the required vote of the Members; 2) filing suit against Doe in 2017, and 2018; 3) fire Chalet Landscapers and hire Herrera Landscapers in the spring of 2017; 4) applied attorney fees to Doe's ledger without a finding of default; 5) determining Doe to be guilty prior to Cagan sending letters on or about May 24, 2017 declaring Doe guilty of multiple violations for which the Association was applying fines; 6) removing fines on Doe's ledger in June of 2017; 7) determining Doe's guilt on June 19 and then on June 22, 2017; 8) making the decision to hire Reserve Advisors to conduct a reserve study in spring of 2017; 9) changing

reserve study consultants to Building Advisors in the fall of 2017; 10) changes in fines on October 3, 2017 from a determination of guilt on September 27, 2017; 11) rejecting Doe's candidate submission in advance of the 2018 board election; and 12) removing Doe's Christmas décor before Doe's prescribed due process rights for a hearing and a determination of default in December of 2018;

b.      Failed to conduct a proper election which makes all of the Board's actions subsequent to the 2018/2019 election invalid;

c.      Failed to properly notice the 2018 special assessment for the replacement of the garage roofs;

d.      Failed to provide proper notice of each violation alleged against DOE, and found DOE guilty of violations of the Community Instruments without proper notice and an opportunity to be heard;

e.      Improperly applied attorney fees to DOE's account that were not incurred by the Association in conjunction with violations for which she was properly charged, given notice and an opportunity to be heard, and voted on in an open meeting;

f.      Sent violation notices to DOE without identifying a specific section of the Community Instruments DOE allegedly violated;

g.      Imposed unreasonably high fines;

h.      Failed to answer records requests sent on March 8, 2017, June 18, 2018, and April 25, 2019;

i.      Failed to keep proper association records;

j.      Improperly failed to give DOE notice of the 2017 annual meeting;

k.      Improperly failed to place DOE on the 2018 ballot;

l.     The Defendants breached their fiduciary duty by failing to strictly comply with the requirements of the Declaration in addition to the IPCA in its handling of association finances;

m.     Engaged in selective enforcement by citing Doe for alleged Christmas décor violations in December, 2018, but ignoring complaints regarding blinking Christmas lights at Unit 45 (expressly prohibited by House Rules adopted May 1, 2018);

n.     Violated ICPA Section 9.2(b) by adding attorney fees before a hearing and a finding DOE was in default.

276.    DOE has been damaged as a result of the actions of the Defendants.

WHEREFORE, Plaintiff prays that this Court enter an order in her favor and against the Defendants, award Plaintiff the costs and disbursements of this action, including reasonable attorneys' fee, and granting such other and further relief in favor of Plaintiff as this Court deems just and proper to prevent unlawful discrimination (including on the basis of disability) in the future and to eliminate, to the extent practicable, the effects of Defendants' unlawful practices.

## COUNT VII: FAILURE TO PRODUCE RECORDS
### (ALL DEFENDANTS EXCEPT LAVIERI AND STROHMAN)

277.    DOE restates and realleges Paragraphs 1-276 hereof as and for Paragraphs 1-277 of this Count VII as though fully set forth herein.

278.    Pursuant to 765 ILCS 605/19, DOE, as a member of the Association, had the right "to inspect, examine and make copies of the records described in subdivisions (1), (2), (3), (4), and (5) of subsection (a) of this Section in person or by agent, at any reasonable time or times at the association's principal office."

279.    Section 9(c)(2) of the Act requires that "[a]ll budgets adopted by a Board of Managers on or after July 1, 1990 shall provide for reasonable reserves for capital expenditures

and deferred maintenance for repair and replacement of the common elements." (Emphasis added.)
765 ILCS 605/9(c)(2)(West 1992).

280.    DOE properly triggered the Defendant's obligations to produce records by providing the notices listed herein.

281.    The Defendants breached their obligations to DOE by failing to produce all of the records required to have been produced.

282.    The Defendants' refusal to produce records, and their failure to produce such requested records constitutes a bad faith denial by the Board as per Section 19(e) of the Act.

283.    Pursuant to Section 19(e) of the Act, any party seeking to compel examination of records requested by a Unit Owner shall be entitled to recover reasonable attorneys' fees if the denial by a board to a request pursuant to Section 19(a)(8) was made or done so in bad faith.

WHEREFORE, Plaintiff prays that this Court enter an order in DOE's favor and against the Defendants and award Plaintiff the costs and disbursements of this action, including reasonable attorneys' fee, and granting such other and further relief in favor of Plaintiff as this Court deems just and proper to prevent unlawful discrimination (including on the basis of disability) in the future and to eliminate, to the extent practicable, the effects of Defendants' unlawful practices.

## COUNT VIII: ICPA VIOLATION 9.2(B) IMPROPER FEE SHIFTING
### (AGAINST ALL DEFENDANTS EXCEPT CAGAN AND LAVIERI)

284.    DOE restates and realleges Paragraphs 1-283 hereof as and for Paragraphs 1-284 of this Count VIII as though fully set forth herein.

285.    Under *Spanish Court Two Condominium Association v. Carlson*, 2014 IL 115342, Paragraphs 32-33, a condominium owner defending a forcible entry and detainer action may challenge "the manner in which the assessment was adopted."

286.    Pursuant to 765 ILCS 605/9(f), only a condominium board has the power to determine and levy assessments included as common expenses under ICPA Section 9.2.

42

287. Charges placed on DOE's ledger were improperly added, and must be removed because charges were placed on her ledger without having been properly determined by the Board after a hearing and a finding of default.

288. The Board failed to comply with its own Declaration mandating that it is the sole entity with authority to levy assessments, and someone other than the Board wrongfully decided which expenses should and should not be assessed to DOE.

289. The Defendants breached their fiduciary duty by failing to strictly comply with the Declaration in addition to the ICPA in its handling of association finances.

290. DOE has been damaged as a result of the actions of the Defendants.

WHEREFORE, Plaintiff prays that this Court enter an order in DOE's favor and against the Defendants and award Plaintiff the costs and disbursements of this action, including reasonable attorneys' fee, and granting such other and further relief in favor of Plaintiff as this Court deems just and proper to prevent unlawful discrimination (including on the basis of disability) in the future and to eliminate, to the extent practicable, the effects of Defendants' unlawful practices.

## COUNT IX: VIOLATIONS OF THE CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT VIOLATIONS
### (AGAINST ALL DEFENDANTS EXCEPT STROHMAN)

291. DOE restates and realleges Paragraphs 1-290 hereof as and for Paragraphs 1-291 of this Count IX as though fully set forth herein.

292. The actions of the Defendants, including but not limited to improper fee shifting as noted above, is a deceptive act or practice under 815 ILCS 505/1.

293. The Defendants intended DOE to rely upon the Defendants' deceptions.

294. The Defendants' deceptions occurred in the course of conduct involving trade and/or commerce.

295. DOE has been damaged by the deceptions of the Defendants, which proximately caused said damages.

43

WHEREFORE, Plaintiff prays that this Court enter an order in DOE's favor and against the Defendants and award Plaintiff the costs and disbursements of this action, including reasonable attorneys' fee, and granting such other and further relief in favor of Plaintiff as this Court deems just and proper to prevent unlawful discrimination (including on the basis of disability) in the future and to eliminate, to the extent practicable, the effects of Defendants' unlawful practices.

## COUNT X: DECLARATORY JUDGMENT-ACTION AT LAW
### (AGAINST ALL DEFENDANTS)

296.    DOE restates and realleges Paragraphs 1-295 hereof as and for Paragraphs 1-296 of this Count X as though fully set forth herein.

297.     Pursuant to 735 ILCS 5/2-701: "The court may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any . . . contract or other written instrument, and a declaration of the rights of the parties interested."

298.    An actual controversy exists as to the following issues: a) the Defendants' actions constituted a violation of Section 9.2(b) of the ICPA; b) the Defendants imposition of fines against DOE for actions that took place prior to there being a rule prohibiting water is illegal and improper and unenforceable; and c) the Board's failure to appoint a commission to investigate the allegations of violations by board members was a violation of the Board's fiduciary duties.

299.    A determination of these items would materially advance a resolution.

WHEREFORE, DOE prays that this Honorable Court find and declare the rights and duties of the parties, and specifically find and declare: a) the Defendants' imposition of attorney fees and fines prior to DOE having been found to have defaulted on the Community Instruments is improper and unenforceable; b) the imposition of fines and attorney fees upon DOE for actions taken prior to the imposition of the anti-watering rules was improper and unenforceable; and c) the Board's

failure to appoint a commission to investigate violations allegedly committed by board members was a breach of the Board's fiduciary duties.

Dated: June 9, 2019                         Respectfully submitted,

*Scott E. Pointner, Esq.*
Scott E. Pointner, Esq.
RATHJE & WOODWARD, LLC
300 E. Roosevelt Road, Suite 300
Wheaton, Illinois 60187
Tel: 630.668.8500
spointner@rathjewoodward.com
ARDC #6237887
*Attorneys for Plaintiff*


THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY FOR ALL ACTIONS SO TRIABLE

## **VERIFICATION**

The undersigned Plaintiff, JANE DOE, does hereby verify, under penalties of perjury under the laws of the United States that she has read the foregoing Verified Complaint, and that the information contained therein is true and correct to the best of her knowledge, except where expressly indicated otherwise.

_____

JANE DOE (a pseudonym)

42